And others Mr. Dabbs will be first up. Where did Shoemaker go? Where did Shoemaker go? My name is Clay Dabbs. I'm an assistant United States attorney in the Northern District of Mississippi. I represent the government in this appeal in the case against Ray Shoemaker and Lee Garner. I was involved in this case before it was indicted. I participated in the trial. I wasn't the lead prosecutor, but I was there, and I've been involved in everything since the trial, so I'm familiar with it. Why do you want us to take notice of this whole interaction with Judge Biggers? I mean, it seems like you've gotten kind of crosswise with him, and I don't know why we would be involved in that. The recent letter that was sent to the U.S. Attorney? Yes. We made the decision to go ahead and send that up to this court because of the statements he made about what we'd said in our brief. And if the trial judge is saying that, we felt like that's something that we should just present to this court. He's making comments about what we said in our brief. And we went ahead and responded to it when we sent it. So that was our rationale there as opposed to just keeping that to ourselves. Okay. I wanted to just make the court aware of that. You wouldn't mind if we just ignore that and decide the case on the basis of this record, would you? No, Your Honor. That might be best. Absolutely not. To be clear, is it your position that these interview notes that weren't produced until, you know, the middle of trial, were JNCSAC materials that did not have to be produced prior to trial? Or are you agreeing that you were late and you're just saying it's not? I'm not real clear on your argument there. They should have been provided, but they wouldn't have been provided, you know, six months before the trial. They should have been provided with everything else before the trial. We thought we had. Okay. So it was a mistake. That's right. You're agreeing with that? Because I didn't understand your argument about the JNCSAC and when they have a discovery deadline and all that. So I was confused about why you were raising that. Can you explain what relevance that has? My point was that there wasn't a, in some cases, you might have an additional order that specifically says provide JNCSAC material and Brady material on this date, maybe three weeks before the trial. And I wanted to make sure that the coroner stood. We didn't ignore an order like that. What we had is your general discovery, Rule 16 scheduling order, and then you've got Brady and JNCS that you provide at the appropriate time. So that was the distinction I was making as far as the scheduling order is concerned. There was nothing beyond the standard scheduling order with a Rule 16 discovery deadline. When did you produce the indictment against your principal witness? The indictment was produced, the trial started on a Tuesday because there was a holiday on Monday. Why wasn't it produced in response to the general order of production? The indictment did not go to guilt or innocence of the defendant. The indictment was Brady on David Channel, one of our witnesses. When your principal witness is indicted facing hundreds of years of sentence in theory, let alone a very serious indictment, that's your key witness and that's not, I guess I don't want to follow your argument there. That doesn't go to guilt or innocence. Sure it does. That's what the fight's about, the credibility of the witness. The fellow that walked out of here, you go after someone to go up the line, so to speak. That's what I don't understand. Why wouldn't you produce that routinely? The reason I call that Brady is it's something they would use to say, well, you're justifying because you've gotten a sweetheart deal with the government. But what's important to know about the indictment, the information that's in the indictment, the criminal conduct. The fact that he had been indicted, presumably it must have been a sealed indictment, was it? That's right. So the government sent him on a sealed indictment against the key witness against these people. And everything's going to really ride or fall where they believe the guy, whether these were briberies or whatever they were and so forth. And he's up to his neck in other things. He's got other deals going. In fact, what brought him to the table wasn't this transaction. It was other matters that you indicted him for. And he then said I'll give you these other people in a wholly unrelated transaction. Now, that to me I just don't understand. You waited until the middle of the trial to produce that? And I'm not suggesting they're not entitled to it. We produced it in time for them to make use of it. There's no criminal conduct in the indictment that's not in the information that he pled guilty to that they have. So the criminal conduct— What's the difference between the content of the information and the indictment? Anything? Well, the question is do they have an opportunity to make use of it? I thought you were saying that the information and the indictment were the same in content. The information has three schemes in the information. He pled guilty to two counts in the information. There are three schemes in the information.  through this garbage collection fees, a construction scheme where he was embezzling from the county, and bogus overtime that he wasn't actually working. But you produced the information off the indictment. That's right. The indictment was entirely about the absolute recovery scheme. Now there's more counts, but it's one scheme. I missed that. The indictment was what? Entirely based on the absolute recovery scheme. So the scheme in the indictment is in the information. It's known to the defense. The difference between the indictment and the information is just the number of counts. There's actually more criminal conduct in the information. Did the indictment charge conduct that's not in this case? Yes, Your Honor. It charged a whole set of problems that Chandler had been having as commissioner, other dealings, right? That's correct. And then the information charged what's in this case? The information also charged other conduct. It was not the conduct in this case. It was other ways that he was basically stealing money from the county as the Panola County. So you're saying the content of the two documents was known to them even though they didn't have the indictment document? That's right. The scheme in the indictment. And they knew there was a sealed indictment out there or not? I can't answer whether they knew about the sealed indictment. You don't know if they knew that there was one out there. Okay. And, again, we provided it to them before the cross-examination started. Now I'm not suggesting that's the ideal time. But it was before the cross-examination started, and they were both able to cross-examine him on the indictment. What has your office done to avoid this kind of thing? Because if we conclude it's harmless error, that's fine for this case for your purposes, but I don't want to see this. One thing that worries me with these harmless errors, it seems like the prosecutors keep doing it because they miss the word error, and they just see the word harmless, and they think that's a ticket to keep doing it. So what has your office done to make sure this doesn't occur in the future? Whether or not we ultimately find harmless error here or find law the case or mandate or whatever. Your Honor, we're a small office. We talk about this kind of stuff all the time. So I think the best. Whatever case is a small office, it's the lawyers in the case we're talking about. Just in terms of the whole office understanding what's going on, I think cases like this definitely have an impact on what we do in the future. I don't think there's any indication that we're making a habit of doing this. It was just David Chandler had not actually read the indictment. He was aware of it. He hadn't actually read it. And we had to get it unsealed from a different judge as opposed to just standing up in court and saying, Judge Beers, would you please unseal this? We'd like to give it to the defendant and that. When counsel then turned to Chandler, when Chandler's on the stand, was he able to develop the origins of Chandler's testimony that, Mr. Chandler, before you dealt with my client, anyone else, as commissioner, you in fact did the following. You in fact had, before you made any statement about them, you were charged and indicted with these other sealed indictments, et cetera, et cetera, et cetera. And it was only then that you then went to the authorities. All that was developed in cross-examination. In other words, if I were defense counsel, I would want that sealed indictment in my hand because that marks the time when there's nothing else implicating the present defendants and this guy is up to his neck and he's giving up all these other people. I mean, that's just the, that's the way, you know that I had that court in charge. Yes, Your Honor. I think they were able to use it. That's why I'm, that's my concern and to address it. They were able to use the indictment and they both cross-examined him on it and Mr. Garner's defense counsel actually admitted the indictment as an exhibit at the trial. So the indictment was admitted as an exhibit for the jury and all that was aired out in front of the jury. The other thing I would say is because this case generated two appeals, the initial case, Lee Garner was acquitted after the fact, after the jury verdict, of all counts that he was charged in. Shoemaker still had counts 6 through 12 and he was convicted and sentenced on those counts. So we, the government appealed the judgment of acquittal and the grant of a new trial. Ray Shoemaker appealed his conviction and in his appeal he raised that exact issue with the indictment, that it was a Brady violation and that he should get a new trial. But you appealed also the thing about Garner. I mean, you appealed as to both. We appealed as to Garner and Shoemaker. So if Garner had another basis to uphold the court's ruling, should have argued the Brady violations as another reason in support of what the judge did, right? That's correct. This goes to the question of law of the case, mandate rule and all that. The opinion, the initial opinion did say, you know, I'm not ruling on these issues and listed a number of issues in a paragraph. So they could have raised that on… They could have said, well, even if he's wrong on what he ruled, we should win on Brady. That's correct, either just in the response or in a cross appeal. So that issue was raised by Ray Shoemaker and dealt with clearly in the opinion. In the previous opinion in this case, we argued both. We had an oral argument for the Shoemaker appeal and our appeal in front of the same panel. It was combined into one opinion and there's a section of the opinion that basically says, you know, lastly, Shoemaker raises these Brady claims and we find there's no reason to grant a new trial. It's exactly the same claims, the 1023s, the FBI reports and the indictment. So those issues were raised and dealt with by this court on the previous appeal. Now, there are two other issues that I see in the opinion that are raised by the district court for the first time in this. You know, we're two years after the trial. Before you leave that, one final question I had about that. The trial court, there's a general discovery order there, which is common to most districts, and that producing the discovery and so forth, and those are very common and they don't necessarily track Rule 16. They're really put in place because they want to do something different than what the rule falls. That's a default position. Now, I read that rule that it was required to produce that sealed indictment. Why wouldn't it? You're talking in terms of Brady. Those orders, I think, sweep a little more broadly than Brady. I would interpret to me that it should be produced when you produce the other jinx material and Brady, which in this case was the weekend before the trial started, as opposed to the discovery deadline, which was a year before the, you know, seven or eight months before the trial. So when the defense sends a letter to us and they ask for, and every discovery letter says this, they ask for Brady, they ask for jinx material reports, those kind of things, that doesn't necessarily change what the law requires of the government just by them sending that letter. You know, I was talking about the court's order. The local court order, I don't know why I don't have it in front of me, but virtually every district has those. We certainly did in Texas Northern when I was on that court. You know, a production order, a general order that is not confined to a particular case. That's the way we practice law here. Why wouldn't that have captured that? I would categorize that indictment as he's indicted and then he's pled guilty to something else. So you're going to use that to say, you know, you've got an incentive to testify a certain way because you've made this deal with the government. I don't want to hold you up on that. It's probably not going to have any real consequence to it, but I must tell you that I don't think that's playing fair in a U.S. attorney's office. I think your obligations as a lawyer are large, and Brady, of course. But when you get situations like this, you can argue with Brady or not. The reality is that sealed indictment of your key witness was very important. Now, in the real world, lots of things get cured at trial, but that doesn't in my book really excuse your sitting on it. And I'm not suggesting— That's all I have to say about you. Move on to something else. You're eating up some of your time. I apologize. I'm not suggesting that was the ideal time to give it. But it was given to them at a time where they could make use of it in their cross-examination. It doesn't have any criminal conduct that they weren't already aware of. The other two issues, this issue of Chandler's plea, statements he made in his plea hearing, as well as this statement that we allegedly made at his Senate hearing, those issues were never raised by the defendants. And the previous opinion in this case is very clear that if the defendants don't raise an issue, it cannot be used as a basis for granting a new trial. So, Your Honor, I will reserve the rest of my time. Thank you, sir. Mr. Hellman. Yes, Your Honor. My name is Mike Hellman. I represent Raymond Shoemaker in connection with this appeal. I assisted in the trial of this case for Mr. Shoemaker. And the key, I think, with respect to what's going on with respect to the government's failure to disclose and suppress evidence is that there was no opportunity for the defense to prepare a proper defense strategy. Okay. Well, now you've had years to think about it. What would you have done differently if you'd had it sooner? We would have done, I think, a number of things differently. To begin with, we would have realized with the 1023s that we didn't get until the prosecution's case was already finished that the prosecution and their witnesses, particularly the FBI agents, had misrepresented things through the course of this case, particularly in front of the grand jury, misrepresenting issues relating to statements concerning the fact that Ray Shoemaker stated to Mr. Chandler that he was afraid that he had been wired, making it look like he's keyed in on something that's going on in the case. Okay. But what difference would it have made in the jury trial? So, you know, I understand maybe you'd want to make some allegation about the grand jury proceeding. You can do that. Right. My question is you're sitting there in trial. Trials are very intense. Right. You're getting ready to cross somebody or you want to do this or that, and all of a sudden another sheaf of documents lands on your desk and you're like, oh, my gosh, what do I do with this? And you're saying if I'd had more time in the trial of this case, not something else, what would I have done differently? I would have tried this case with a focus toward trying the government for their misconduct in getting in bed with Chandler because Chandler stated from the very beginning, or excuse me, Agent Wright stated from the beginning that everything Chandler said to her to begin with was a lie. As the course went forward, this agent, as we found out after we got this information, quit doing 1023s. She misstated things that Chandler had said to her. There are statements such as. Were you not able to bring that out at trial? We weren't. The examinations were completed. We didn't even get the 1023s to their cases. Did you request to be able to recall her to prove herself? We requested the opportunity to recall witnesses. We were unable to do it. Okay, so you requested to recall and that was denied. We specifically recalled Chandler. Right. It was not denied and you recalled him and you questioned him. That's right. Who did you request to recall that was denied? At that point in time, we did not recall. I don't think we specifically requested to recall Wright or, frankly, the other witnesses. And the reason why is there was nothing that could be done at that point in time in the case. Why? In other words, you've had an agent get up there with the flag all over her looking good and then you find out she's a liar. You bring her back and you show that. Why isn't that good stuff? I don't think it works before a jury because the jury has already made a determination. We just got these documents that show you're a liar. We got them handed by your people yesterday night and you didn't give us that before, did you, ma'am? And here's what shows you're a liar. I think that's good stuff. That's extremely powerful. I don't understand why you wouldn't do that if you thought it would be, if you got that information and wanted to question her about it. I mean, I don't understand that. Could that have been something that could have helped? Possibly. But if we had the material when we were supposed to have it so that we could prepare a proper defense strategy going forward in the case, we think there's a good likelihood, a reasonable likelihood, that the jury wouldn't have believed her and the jury would have put the government in the same camp as Chandler, and that is a group that had become dishonest. And the defense was just different than it would have been from that approach. There was no attack. There was no ability to attack that angle of the case and to put those two together. And ultimately it wound up having to look like the defendants and Chandler were in bed together and had been for a long period of time. And that severely damaged the case. Okay. And did you raise this at that time? We raised the, yes, we raised all of the failure to produce and the suppression of evidence during the motions. No. I mean, in trial they start showing up. You know, I wasn't a criminal district judge, but I was a civil district judge in state court, and when people were showing up with stuff in the middle of trial, the other lawyer would be screaming and yelling and jumping around and all that. Were you doing that? We did. Okay, because I didn't see that you objected on the indictment, the failure to produce the indictment sooner. There was an objection to the failure to produce the indictment. That would have been particularly done by Steve Farese because he was involved primarily in the cross-examination of Chandler with respect to all the 1023s and the failure to produce other documents. On the indictment, was there an objection made? Yes, there was. Because I didn't see it, so I could have missed it. That's fine. So you can get me a record cite on that? I believe so, yes. Okay. In addition, in the 1023s, there are statements. There's a statement in the, I believe, let me see what the date is. I can't remember exactly which one it is, but there is a statement that there was a recorded statement made of Shoemaker, and that statement was never produced to us. We never got it. We never had the opportunity to even get that and see what it was. Shannon Wright that wired him? Who wired Chandler? I believe it was Shannon Wright. That was my impression. Also, Agent Quacka, I think, was involved in that as well. When did you get the tapes? We received some of the tapes with the discovery. We did not get that tape. We didn't know that tape existed until after we got the 1023s, after the prosecution's case was already concluded. In addition, during her testimony at trial, Agent Wright testified that she continuously took notes of her conversations with Chandler. We never received any of those. We didn't get the statements. They have a policy in the government with the FBI that they take, in that division that they take. They do 1023s, particularly with respect to material issues. There is not a single 1023 which raises the fact that Mr. Chandler ever said that he solicited or was paid money that Mr. Garner or Mr. Schumacher were involved in any kind of bribery scheme. It doesn't exist. There is no 1023 that talks about that. They violate their own rules with respect to these issues. They should have and they would have had those kinds of statements in this discovery. It doesn't exist. It's as if this was made up the evening before the indictment or, excuse me, before the grand jury. And the story is continually changed, and there's no record except perhaps Agent Wright's notes that she took. She said she took a lot of notes that we never got. Did they take the tapes before the grand jury or not? Or did Agent Wright testify without tapes? I don't know. I think they brought some of the tapes, and I think Agent Wright testified. That's my understanding. I don't know how much of the tapes they played, but I think they did play some. Okay. So maybe I'm misunderstanding. Are you saying there's still stuff that hasn't been produced? Yes, Your Honor. As of now? As of now. Okay. And as I understand it, quite a bit of stuff. Well, it seems like Judge Biggers is very animated about the case. Why hasn't he ordered this production if there's still stuff missing? I don't know. Okay. I think that the prejudice, the material impact on the defense is, I mean, we still don't have some of the evidence. There's no way to properly prepare a defense strategy, a cross-examination of witnesses, case strategy going from start to finish with a jury that's going to see two defendants for a week and not even have evidence what we're now three years later, and we still don't have some of it. Much of it we didn't even get until the prosecution's case was completed. The cross-examination that was done of Chandler to add on the piece that dealt with the unsealed indictment that was finally released is a split of the cross-examination. You've got a cross-examination of a witness that's gone on and on, and now it just looks like you're piling on more information. The use of that indictment is different if you're using it in your primary examination and you're using it for the proper purposes. Instead of just coming back and beating up on a witness, which is what it appears it is, at the end of a trial when you're trying to recall a witness. And all of these things, I think, culminated to damage and to result in a different result with respect to whether or not the jury believed anything that Mr. Chandler had to say. I think they would have had a different view of it. Did the judge give reasons for his acquittal, initial acquittal, which I understand the prior panelist, the earlier panel, the earlier case, I suppose about, I just wondered what reasons he gave. For the acquittal the first time on counts one through five? Right. The basis was the agency issue, that Chandler was not an agent that could be convicted under the . . . Yeah, I remember that one, but it wasn't sufficiency of evidence on other issues. It was not. Okay. Thank you, Mr. Allen. Ms. Epps? I'm just sitting on that side. To me, here's the problem from my 2020 hindsight of not having been at this trial. You had David Chandler. David Chandler is not a very liable person. He's got all sorts of baggage that he brings to this trial. And the only thing I think that caused the jury to credit a single word that he said about anything was that you had Shannon Wright, the FBI agent who was in charge of this case, and Agent Luke, who was a USDA agent, who said that they went and talked to Garner the day before, a couple of days before the first indictment, and he said, according to them, I paid David Chandler to get business at Tri-Lakes. Now, a couple of days later, in a recorded conversation between Chandler and Garner, Garner references that conversation with his two agents, and he says, I told them that I paid people for getting business at hospitals where I didn't know people, like Grenada, which is not at issue here. This is another. He did business all over. And Chandler helped him to get business from all over. So you've got an issue at trial. I think the only way they get a conviction is if they get the jury to believe that Wright and Luke are telling the truth. Now, what they were able to argue by implication was that Wright and Luke were mistaken. They're earwitnesses. The earwitnesses are just not reliable as a rule. And these two people were wanting to hear that Chandler said, that Garner said, I paid Chandler for getting business at Tri-Lakes, the hospital that's at issue. They wanted to hear that. And so you've got an argument, are they just mistaken? Did he say what he said to Chandler in the later conversation? I paid to get business or I paid to get business at Tri-Lakes. And so the only real impeachment that they were able to do of Wright and Luke was based on they were mistaken. But now what happens is, mid-trial, you get these 1023s that come in. And this is after the prosecution has closed its case. And they lay 30-some-odd 1023s on them that they had not given them before. And so they've got to make a decision about what to do with these 1023s. Now, it's a little subtle because these 1023s don't have a lot of information that is specifically exculpatory. What, if you think about it, if you have time to think about it, how they become exculpatory is by what is not in the 1023s. And what is not in the 1023s and what is not in the other 302s and 1023s, they only gave them two others, what is not in any of these is one single word from David Chandler saying, Lee Garner paid me money for influence at Tri-Lakes. And I paid money to race Shoemaker to Tri-Lakes. There is not one single word. Now, frankly, I find that mind-boggling. But what did Wright testify to? You're saying that what her testimony, the critical testimony of the characterization of statements that were made are not in the 1023s. What did she testify to then? She testified. Now, here's where it becomes and here's where it works into the defense. What she testified to and what David Chandler testified to before the grand jury was that Garner paid Chandler to get the contract with Tri-Lakes. Well, in truth, at trial, they had to change that because the contract was entered into four months before David Chandler ever solicited any money from Garner. So it was not possible that he did that. It was just wrong. Now, the other thing that they tell the grand jury that they had to change at trial was that Garner inflated the contract to pay the bribe to Chandler. Now, again, that's not possible because he wouldn't have known to do that because the contract was entered into way before. And then after they investigated it, they found out that he was charging less than the people before and the other people. So it was not an unreasonable amount. But what they tell the grand jury is Garner defrauded the hospital out of tons and tons of money, millions and millions of dollars, by padding the contract. And they had to change that testimony at trial because it just was simply not true, and they admitted it wasn't true. So you've got a U.S. Did the defense know that was not true at that time in trial? I don't know. According to the government, what the government says is that the grand jury, that they had given them the grand jury testimony, and that that was sufficient for them to know what Chandler was going to testify to, and therefore they didn't need the indictment and they didn't need these 1023s. But Chandler changed his testimony at the trial. So merely providing the grand jury transcript obviously is not sufficient. And furthermore, that's kind of like saying you've got a witness who testifies at the grand jury that your guy did it, but he's made 67 statements over here that he didn't do it, and you're not entitled to those because you know what he testified to before the grand jury. But the operative thing here is that in one of those 1023s that they got at the close of the trial, there is a statement coming from an FBI, the FBI agent POCA, recorded that we got the contract. Chandler brought us a copy of this 2005 contract. So they knew or should have known, and they got this about a month before they testified to the grand jury about this contract business, so they knew when they went before the grand jury and sponsored this testimony, or at least they should have known, that it wasn't true. And not only did the agent testify to that, and Chandler testified to that, but the AUSA asked him several times, did he have the contract to pay you the bribe? Yes. And so what this does, I think, and what was not readily apparent to them at trial, was it gives them an argument that this whole entire case, including the very, very important testimony of Luke and Wright, is based on complete fabrication. Now, a jury is not there to give the government the benefit of the doubt about whether or not they did. They're there to give the defendant the benefit of the doubt, and I think a skilled attorney could have used the fact that they knew or should have known that their grand jury testimony was a big, fat fib to argue that there is something very rotten about this prosecution. And it is not credible, and Judge Biggers did not find it credible, that they did not make any 1023s about what Chandler said. And so the only reason why we didn't get anything about that, you could make an argument that the only reason you didn't get them is because there's something exculpatory. Ms. Epps, your time has expired. Thank you. Mr. Krabs. Is there still stuff that you should have produced that you haven't? Your Honor, I'm not aware of a tape that hasn't been produced. Well, is there anything, any document, any notes, any e-mail, anything in cyberspace that bears upon this case that hasn't been produced? Your Honor, there's not anything that would call any question to the verdict in the case. Okay, well, that is a worrisome answer, because that makes it sound like, yes, there is, but I don't think it's a problem. Is there anything? They're saying three years after the fact that they're still bumbling around trying to get more discovery. This is worrisome to me. If we were to affirm this new trial, are you going to go back and start showing up with file folders in the middle of trial again? No, Your Honor. And I want to be clear, there's not a tape of a defendant that hadn't been given to the defense. Okay. Are there interview notes, any jottings whatsoever around that subject matter, interview notes, notes about anything Chandler said, notes about things he didn't say, anything that bears upon the credibility of a witness, any of that? Is there anything like that out there that you haven't produced? No, Your Honor. Your Honor, and I want to go to the indictment when it was produced at the trial. It was, like I said, the trial started on Tuesday. We gave him the indictment on Wednesday during lunch hour, and there was no objection at that time. The next day, Judge Biggers brought it up, where he says, Why didn't you give the indictment? And there's a back and forth with Mr. Spillers. The defendants never objected. That's right. At that point, the defense counsel went on to a question about the unsealing of the indictment and media coverage, but there was no additional objection that I can see or that I remember in the record. They did make a big deal about the 1023s, but they didn't ask to recall. They moved from mistrials. That's right. They didn't ask to recall Agent Wright. That's right, and had the opportunity to do so. In fact, they did. The judge specifically gave him the right to recall a different agent, and they didn't recall that agent. They just recalled Chandler. That's right, whoever they wanted to call him. And they did raise the indictment in the motion of the new trial. Right, but that's a little late.  Chandler was paid a percentage. Garner paid Chandler a percentage of his business at the hospital, $5 an hour. He was the administrator of Pinole County, the county on the hospital, and he was the chairman of the board of the hospital. Now, he didn't even dispute that. In fact, his own expert testified that he paid him $5 an hour. Now, our position the whole time is that that's a kickback. So this question that, you know, there's nothing that corroborates Chandler, when Chandler says he's paying me $5 an hour, well, that's exactly what Garner said, just disputed that it was illegal. He said, well, that's just good business. He's just paying him for collections. But there was no evidence that he did anything other than just pick up a check. What about this notion that these agents were liars, and if they'd had these statements earlier, they could have tried the government, not just Chandler? I mean, they clearly knew Chandler had problems with credibility, so I don't buy any argument that they didn't know that. But they didn't necessarily know that about the agents. So what about that argument? Well, I would certainly dispute that the agents are lying, obviously. But they think that there's a lot of stuff missing that should have been there if it really happened. And they're saying they were hampered in being able to say, Agent Wright, if this happened, this would have been big news and it's not in your report. And those questions were asked over and over and over and over, Agent Wright, when she was crossed about errors in the investigation and leaving things out and not doing this and not doing that and what you said to the grand jury is not true. I mean, she was cross-examined extensively on that, so it's not as if they didn't do that in the trial already. And it was a very effective cross-examination of Chandler. And certainly from our perspective, you know, I don't want to end a trial with his cross-examination, which is what happened. You know, I would have much rather them just asking him about it the first time they testified. So there's nothing here that warrants the grant of a new trial. We've got two issues that were already raised in the first appeal and dealt with by the previous panel and two issues that were never raised by the defense in the first place. And so the basis of the law is clear that the district court can't use something that the defendants didn't raise to grant a new trial. Thank you, Your Honor. Thank you, Mr. Abdu.